285 So.2d 370 (1973)
Bobby L. CARROLL, Plaintiff and Appellee-Appellant,
v.
SOUTHERN CASUALTY INSURANCE COMPANY, Defendant and Appellant-Appellee.
No. 4336.
Court of Appeal of Louisiana, Third Circuit.
November 5, 1973.
Rehearing Denied December 3, 1973.
Writ Refused January 25, 1974.
*371 Gist, Methvin & Trimble by DeWitt T. Methvin, Jr., Alexandria, for defendant and appellant.
Wm. Henry Sanders, Jena, for plaintiff and appellee.
Before FRUGE, SAVOY and DOMENGEAUX, JJ.
DOMENGEAUX, Judge.
This is a workmen's compensation suit in which plaintiff, Bobby L. Carroll, alleges that he sustained a shoulder injury on November 25, 1971, while in the employ of Frank Doughty, and that as a result of said injury he has been and is totally disabled. Compensation payments were made from the date of injury until March 27, 1972, at which time they were terminated. Thereafter this suit was instituted against Southern Casualty Insurance Company, the employer's compensation insurer. Judgment was rendered by the trial court in favor of plaintiff, awarding him compensation benefits based upon total and permanent disability, but rejecting the claim for penalties and attorney fees. From that judgment both defendant and plaintiff have appealed.
The issues presented to this court on appeal are:
(1) Whether plaintiff is totally and permanently disabled, and
(2) Whether penalties and attorney fees are due under LSA-R.S. 22:658.
At the time the accident occurred plaintiff was employed by a pulpwood producer to do heavy labor, consisting principally of cutting and loading heavy pieces of pulpwood on trucks. On November 25, 1971, he slipped and fell while traversing a hill in search of suitable trees to cut, thereby sustaining an injury to his right shoulder. Plaintiff left the job site and returned home to see if bed rest would alleviate the pain. However, upon arrival, he was informed of a death in the family and was forced to go to Oklahoma to attend the funeral. Upon his return plaintiff persisted in his work, in spite of pain, but was unable to satisfactorily perform his labor.
On December 1, 1971, plaintiff was examined and treated by Dr. I. C. Turnley, Jr., a general practitioner of Jena. Doctor Turnley found swelling and tenderness in the right shoulder joint and was of the opinion that plaintiff had a possible separation of the acromioclavicular joint. Plaintiff was instructed to return within the week if there was no improvement, which he did on December 8. Doctor Turnley immediately referred plaintiff to Dr. T. E. Banks, an orthopaedic specialist of Alexandria, whom he saw on the same day. Doctor Banks' examination confirmed Doctor Turnley's diagnosis and plaintiff was admitted to the hospital the following day. On December 10 an operation was performed to stabilize the shoulder joint so as to allow the ligaments to heal. Thereafter Doctor Banks saw plaintiff on December 11, December 17, January 7, 1972, and January 14. On the latter date local anesthesia was administered to plaintiff to remove a broken wire used in the operating procedure. At this time Doctor Banks advised plaintiff to return to the care and treatment of his local physician, Doctor Turnley, and to start gradual activity. *372 Plaintiff returned to Doctor Turnley on January 18, 1972, and on February 8, at which time he was instructed to return to light work. Subsequently, on March 14 Doctor Turnley released plaintiff and was of the opinion that he could return to his usual work.
Both of the aforementioned physicians told plaintiff to return if he had further difficulties, but plaintiff did not again see a doctor until shortly before trial. However, the transcript reflects that plaintiff, although in pain, felt that he could not afford to return to seek medical attention after his release and subsequent termination of workmen's compensation benefits and medical payments on March 27, 1972.
Following the discharge and termination of benefits plaintiffs sought employment in order to support his wife and four children. Because of his lack of education and training he was forced to return to the only work both he and his father had known, pulpwooding. Plaintiff's testimony indicates that while engaged in the heavy manual labor he suffered severe pain during work and incurred a swollen shoulder with burning and aching sensations after working hours. Swelling caused a knot to often form on the shoulder and plaintiff was unable to sleep at night. Plaintiff further testified that use of a saw only augmented the swelling and accompanying pain. Nor could be carry the large pulpwood logs or put weight upon his shoulder, as was required of a pulpwood laborer.
Thereafter plaintiff worked at manual labor as a "roughneck" in the oilfields for four or five weeks and as a "grunter" for a high line construction company. His testimony points out that he was unable to do these jobs efficiently because of the continual swelling and pain in the shoulder, thereby decreasing his former strength, which was a necessity in such jobs.
Plaintiff again returned to the pulpwood industry where he worked with a logger "hooking tongs". As the trial judge recognized, this job was substantially different from that of his former duties in the pulpwood industry. As high water forced a shutdown of the pulpwood operations, plaintiff was not working at the time of trial. He however indicated that, despite his pain, he would return to the same work after the water subsided and work recommenced, in order to support his wife and four children.
The record shows that plaintiff is not a malingerer. Instead he has strived actively to support his family, enduring the pain that he must have continuously experienced. Perhaps a man of less fortitude would have immediately discontinued work and demanded compensation for total and permanent disability.
After suit was filed on May 5, 1972, plaintiff's attorney sent him to Dr. M. B. Bailey, Jr., an orthopaedic surgeon of Monroe, whom he saw on May 12, 1972. Said orthopaedist was not however called to testify at trial.
Plaintiff was again seen by Doctor Banks on August 2, 1972. Plaintiff complained to the orthopaedist of a burning and aching sensation, after a period of labor, in the scapula region behind the shoulder, rather than the site of injury. The doctor found tenderness in this area and was of the opinion that the transverse scapula nerve was irritated. A cortisone injection was administered to relieve the irritation.
He testified:
". . . I mean I thought his complaints were true complaints, and I thought he was having a little difficulty, but . . . I thought that basically he could do pretty much what he could do before with a little minor discomfort from time to time."
When asked about plaintiff's complaints of pain when carrying logs on his shoulder, Doctor Banks stated:
"Q. Dr. Banks, assume the man changed these jobs primarily because of *373 job requirements that he carry a hundred and twenty pound log on his shoulder, while working in the woods, and this interfered with his working, and he sought other types of employment. And assume he complained with feeling pain when carrying these logs on his shoulder. Would you think there was anything related to his original accident that would cause him to suffer pain?
A. Well these people who have an injury to the joint which is right on top of the shoulder, and also such an injury of such magnitude that it requires surgical fixation often will have this as a complaint for some time afterwards, because they are actually traumatizing the area of the original trauma. So it is entirely within reason that this man might be limited in carrying particularly objects of small diameter on the shoulder that might give localized pressure to the area of traumayes."
Doctor Turnley also re-examined plaintiff on May 7, 1972, the day of trial. At that time, when asked for an opinion as to plaintiff's present condition, he explained:
"Following a separation of the acromioclavicular joint and following its healing, very often we findI shouldn't say very oftenoccasionally we find residual effects in the shoulder joint caused by disuse and effects from the injury itself, trauma to the joint capsule and so forth, which causes a swelling of the synovial tissue, this is the lining of this joint and the bursa surrounding it. This synovial tissue, being very sensitive, is often frequently the cause and origin of subsequent pain. It will make the shoulder joint, or that particular area, more sensitive to trauma, it will make it more sensitive to excess use, and many other things, all of which are relatively minor, but they are noticeable and they cannot be ignored when they do occur. Now, this man developed what we call tendonitis following this episode, which is nothing more than just an inflammatory process at the attachment of the tendons around this acromioclavicular joint. And this will cause pain and increased sensation and some swelling of the joint and so forth, for an indefinite period of time. Now we can immobilize his shoulder and it will get better, but when he starts using it again it will reoccur. For a period of time, and I don't know how long, maybe a year, maybe two years, maybe ten years."
He further testified:
"Q. Now, there are some things, that if he can put enough weight on his shoulder, or sharp objects resting on it and all, or if he used it in a pulling or jerking type manner, real strenuous work, is it your opinion that this would cause it to be inflamed and have some discomfort, some swelling, some pain?
A. Much more so than if this were to occur to the other shoulder. The degree of this that you mentioned is of course variable. It depends on many factors. It doesn't have to be a sharp object. Pressure to the top of the shoulder tends to cause a separation of the joint. And any sort of pressure on top of the acromioclavicular joint tends to stress this joint whether it's been injured or whether it hasn't. And if it is previously injured, then it is more likely to be sensitive than if it has not been previously injured.
Q. Now, do you feel that Mr. Carroll's shoulder is more sensitive than if it hadn't been injured?
A. Well, it is. It swells, it's tender and it's painful. These are objective findings.
Q. And are these things that you found today?
A. Yes. And they are mentioned in these other reports."
Doctor Turnley also was of the opinion that plaintiff's area of tenderness was consistent *374 with the injury and that plaintiff's complaints were "more than usual" sincere and not over reactive.
When questioned by the court as to the amount of pain that plaintiff would experience by carrying logs on his shoulder, the doctor stated:
"WITNESS: Well, we've already established pretty well that there will be some pain for a period of time. I do not know and do not know how you can find out how long this pain will persist. It should be related to the treatment that he gives this shoulder now. There are certain things that we can do to alleviate this inflammatory process, and in a period of time it usually clears up. In fact, I would say it always clears up. The point I want to make is, I cannot give you a time limit. And during this period of time I cannot tell you how much it's going to hurt, because I don't know. I have no way to know.
THE COURT: It would be more likely to clear up if he stopped working in the woods and went to work as a truck driver or
WITNESS: Correct.
THE COURT:or delivering bread or something like that
WITNESS: Right.
THE COURT:as long as he tries to (interrupted)
WITNESS: He can do that now, without any further difficulty.
THE COURT: But if he was to try on a regular basis to go back in the woods, this will(interrupted)
WITNESS: This will alter his activity. How much I don't know. He may work all week and never have a pain. He may go out and work two hours and have all the pain in the world. So this is one of those things that you can talk about for three days and you still will not come up with an answer. I can truthfully say though that if the treatment that we could offer this man is not effective, that there will be some pain, but I don't know of any people who have not cleared up from this. I can't quote you a single instance where this injury did not clear up."
Defendant contends that the pain and discomfort which plaintiff would suffer on returning to his former type of employment is of such a minor nature that it would not justify classifying him as being disabled. In that connection defendant points out that according to Doctor Banks plaintiff could work with a "little minor discomfort" and that Doctor Turnley felt the effects were "relatively minor". It is argued that the pain must be "substantial" in order to justify a holding that plaintiff is disabled within the meaning of the Workmen's Compensation Act.
Even though we find isolated reference by the treating physicians to plaintiff's condition as being "relatively minor" or "minor discomfort" it is apparent to this court, from a reading of the medical testimony as a whole, that plaintiff's pain cannot be classified as minor or insignificant. Plaintiff has tenderness, swelling, and considerable pain in the shoulder area whenever he performs heavy labor. Of particular significance is the acknowledged tenderness on top of the shoulder which prevents plaintiff from putting any weight upon this area, and hardly enabling him to place a 150-pound pulpwood log thereon. This heavy labor is plaintiff's only means of livelihood, one which he must endure day after day in order to support his family.
The law does not expect, nor does it contemplate, that a worker, in order to earn a living, must work in pain, or that he do so when it will materially increase hazard to his health and safety. Lawless v. Steel Erectors, Inc., 254 La. 37, 222 So. 2d 849 (1969); Brannon v. Zurich General Accident & Liability Ins. Co., 224 La. 161, 69 So.2d 1 (1953); Lavergne v. Southern *375 Farm Bureau Casualty Ins. Co., 171 So.2d 751 (La.App. 3rd Cir. 1965).
It is of course recognized where an employee is unable to resume his former employment without inducing pain, that to be deemed totally disabled the pain must be more than a trivial or minor discomfort, or those ordinary aches and pains to which all flesh is heir. Glidden v. Alexandria Concrete Co., 242 La. 625, 137 So.2d 894 (1962); Lavergne v. Southern Farm Bureau Casualty Ins. Co., supra.
Our Supreme Court, in Glidden v. Alexandria Concrete Co., supra, observed:
"It would be illogical, however, to treat this doctrine as encompassing all degrees of discomfort and make a complete or "good-as-new" recovery essential before an employer may stop compensation payments. The pain must be subtantial enough to be disabling in that it either prevents the worker from carrying out some of the functions of his job or, where the pain is not so intense as to hinder the worker's fulfillment of his duties, it must be shown that performance of the work would be deleterious to his health. This would be the case where going back to work was possible but doing the work might retard the worker in regaining complete recovery of his health."
This court has further indicated that a workmen's compensation claimant is considered totally disabled when, because of an injury received in an accident, he is no longer able to perform, without pain, the heavier duties of the occupation in which he is injured. Bushnell v. Southern Farm Bureau Casualty Ins. Co., 271 So.2d 267 (La.App. 3rd Cir. 1972); see also Hay v. L. L. Brewton Pulpwood, Inc., 241 So.2d 562 (La.App. 2nd Cir. 1970).
Each case must rest upon its own facts. In the instant case it is evident from the medical evidence as well as from plaintiff's own testimony that as a result of pain he is unable to fulfill the functions of his former job. Plaintiff can no longer place the large pulpwood logs on his shoulder, nor can he use a saw without considerable pain. Prior to the accident, he customarily performed these duties and other heavy labor requiring the use of his shoulder. The record further indicates that if plaintiff continues his former work on a regular basis it would likely be deleterious to his health and recovery.
The trial judge concluded:
". . . [the pulpwood field] . . . calls for more physical agility and movement and sheer hard work than most others . . . . I'm of the opinion that this man cannot do the work that he was doing before without pain or without his arm swelling up, and Dr. Turnley testified that he felt that the man's complaints were genuine. . . . . any time this man puts in a full day's work without help, his arm swells up and he has considerable amount of pain. Now, under the circumstances then, he has been able to work doing something radically different; as I see it, handling tongs around pulpwood is really quite a bit different because handling a saw is very difficult, much more difficult than carrying a set of tongs and attaching them to a tree, allowing somebody else to turn on the machine and drag the wood out.
So I am of the opinion that he can't work without the aid of a helper. I am also of the opinion that continuation of employment of a nature that he did at the time he was hurt just prolongs his disability. Dr. Turnley said that continuation of this will aggravate it and that he is likely to continue to have this type of trouble any time that he goes back to work and tries to do so without help."
We cannot say that the trial judge erred in arriving at that conclusion.
Further, where a claimant is totally disabled at the time of trial, and the evidence *376 is uncertain as to when he may recover, compensation should be awarded for the maximum number of weeks prescribed for permanent disability, since the defendant insurer is protected by the provisions of LSA-R.S. 23:1331, permitting revision of the judgment after six months, should the disability terminate.
Defendants point out plaintiff's failure to call the orthopaedic surgeon, Dr. M. B. Bailey, Jr., who had examined him on May 12, 1972. This they say creates a presumption that Doctor Bailey's testimony would be adverse to plaintiff's case. We agree that such a presumption arises under the circumstances, however, we opine that whatever detrimental effect that presumption may have on plaintiff's case is overcome by the direct testimony of both Doctors Banks and Turnley.
On the question of plaintiff's request for penalties and attorney fees, we can only judge defendant's actions primarily upon the facts existing and known to him at the time payments were stopped. (Emphasis ours). These facts must justify discontinuance. Lee v. Smith, 248 La. 16, 176 So.2d 413 (1965).
Defendant terminated benefits on March 27, 1972. The only relevant evidence introduced by defendant are reports from Doctor Turnley dated December 7, 1971, February 28, 1972, and April 3, 1972. The February 28th report stated that plaintiff would return to Doctor Turnley's office on March 8th for evaluation and would probably (emphasis ours) be discharged at that time. The April 3rd letter, to the effect that plaintiff was able to resume work as of March 14, 1972, was not received by defendant until April 5, 1972, over one week after benefits were terminated.
Defendant offered no other evidence indicating that, as of the date of termination, it had knowledge of plaintiff's release to return to work on March 14, 1972. Nor did defendant elicit such testimony from Doctor Turnley at trial. The only conclusion that can be reached is that such stoppage was unjustified under LSA-R.S. 22:-658.
Mere suspicion is not enough to discontinue benefits. Likewise, the receipt of adverse medical information after an arbitrary denial or discontinuance has precipitated suit does not exculpate an insurer from such penalties. Delafosse v. Industrial Painters, Inc., 199 So.2d 559 (La. App. 3rd Cir. 1967).
This court, after serious consideration, is therefore of the opinion that statutory penalties are due and that under all of the circumstances the record justifies an award of $2,500.00 for penalty attorney fees.
For the above reasons, the judgment of the trial court is amended insofar as it denied plaintiff's claim for penalties and attorney fees, and it is now ordered, adjudged, and decreed that there be judgment in favor of plaintiff and against defendant for statutory penalties at the rate of 12% on those amounts due and for attorney fees in the sum of $2,500.00.
Accordingly, for the foregoing reasons, the judgment of the trial court is affirmed as amended. Costs of this appeal are assessed against Southern Casualty Insurance Company.
Amended and affirmed.