342 So.2d 874 (1977)
Evans NORRIS, Plaintiff and Appellee,
v.
SOUTHERN CASUALTY INSURANCE COMPANY, Defendant and Appellant.
No. 5755.
Court of Appeal of Louisiana, Third Circuit.
January 31, 1977.
Rehearing Denied March 2, 1977.
Writ Refused April 22, 1977.
Baker, Culpepper & Brunson by Bobby L. Culpepper, Jonesboro, for defendant and appellant.
Whitehead & McCoy by Charles R. Whitehead, Jr., Natchitoches, for plaintiff and appellee.
*875 Before HOOD, DOMENGEAUX and WATSON, JJ.
DOMENGEAUX, Judge.
Plaintiff, a 58 year old pulpwood worker, filed this workmen's compensation claim for an on the job injury.[1] Made defendant was his employer, Albert Clifton, a pulpwood contractor, and the latter's compensation insurer, Southern Casualty Insurance Company. The district judge awarded Norris a judgment for total and permanent disability benefits, medical expenses, travel expenses for securing medical services, incidental expert witness fees and statutory penalties and attorney's fees of $2,500.00. Defendants have appealed suspensively to this court.
Two issues only are presented:
(1) Is plaintiff totally and permanently disabled within the intendment of the workmen's compensation law?
(2) Were the actions of defendant insurer such as to cause the assessment of penalties and attorney's fees?
Plaintiff was injured on April 24, 1975. He was hired as a woodcutter, and his employment required that he cut pulpwood trees with a gas-powered saw into lengths of approximately 5 feet, weighing up to 50 pounds each. The trees vary in size of from 5 to 10 inches in diameter. Plaintiff was required to stack the pieces of wood into piles. His duties necessitated stooping, squatting and bending with the resulting physical stress and strain. He was paid according to the number of cords of wood he sawed and stacked.
The accident occurred when plaintiff was cutting a tree upon which another partially severed but not fallen tree was resting. When the tree he was cutting fell, it dislodged the second tree which fell on plaintiff, knocking him down. He received a contusion of his head with laceration, a probable concussion, injury to his right thigh and knee, and bruises to the left arm and chest. All injuries healed in time, except those in the area of the right knee and thigh, and it is these which gave rise to this litigation. Accordingly, our discussions concerning plaintiff's condition will be limited to those last referred to injuries.
Plaintiff was hospitalized for two days and treated then and subsequently by Dr. Robert R. Sills, a general practitioner. He was also examined and treated by Dr. Ray J. Beurlot, an orthopedic surgeon and was also examined by Dr. Joseph A. Thomas, a general practitioner, the latter being the last physician to examine plaintiff prior to the trial of this case.
While he was still under the care of Doctor Sills, plaintiff voluntarily returned to his employment with Alfred Clifton approximately a month after his accident. Plaintiff's basic complaint is that because of weakness, instability, swelling and pain in the area of his right knee, he cannot perform a full day's work. His knee "gives out" frequently, causing him to lose his balance and fall. Some days he cannot work at all, and when he does work he is limited to from four to six hours per day, whereby prior to his accident of April 24, 1975, his work day was never less than eight hours per day. As a consequence of his reduced working capacity his earnings are proportionately diminished.
Around the first of September, 1975, finding that the area of hills and hollows in which he was working made his job more difficult, plaintiff went to work for another pulpwood contractor, Morgan Shackleford as a woodcutter but under the same work limitations. The area in which the latter's operations were being performed was less hilly.
In addition to plaintiff's testimony concerning his knee condition and the resulting effect which it has on his work ability, there is lay testimony which, in its totality, substantiates plaintiff's claims to an appreciable degree. The lay testimony referred to was elicited from plaintiff's wife, Morgan Shackleford, and one Trent Shacklefore. Plaintiff's employer, Albert Clifton, *876 admitted that the former had complained to him about his knee trouble since the accident.
Doctor Sills saw and treated plaintiff on April 24, April 26, April 30, May 7, May 19, and finally June 2, 1975. He found that plaintiff's right leg and thigh was contused and swollen. There was pain from the knee to the thigh. The right thigh had some enlargement, particularly on the medial side above the knee. At the last visit of June 2nd, the doctor though plaintiff was progressing satisfactorily, and advised that plaintiff exercise his right leg and to apply hot packs. The doctor had previously sent a report to the adjuster of the defendant insurer in which he stated "He [plaintiff] might be able to resume regular work on May 30" [1975]. In his deposition the doctor remembered that the referred to report was just about the time that he had last seen plaintiff (June 2, 1975), and he further cautioned "and you notice I said light work as a trial". He said that May 30th would be a projected time when he thought plaintiff might go back to work. On cross-examination Doctor Sills stated that as of June 2, 1975, he would not have passed plaintiff for a full time manual labor job on a 40-hour week. The doctor finally testified that inasmuch as he had not seen plaintiff since June 2, 1975, he could not say whether Norris has or has not sustained any permanent residual disability as a result of the April, 1975, accident.
On June 27, 1975, the adjuster for the defendant insurer received a letter from plaintiff which in pertinent part reads as follows:
". . . This is to advise you that I got hurt on the job working for Albert Clifton over two months ago at Moro, La. and left me injured in my right leg & left arm and I can't work but 4 or 5 hours a day because my leg fives out on me. but I received about $600.00 compson [sic] and I haven't heard any more from you. I am wondering if you planning on making a settlement with me ......."
In response to the letter the adjuster assigned an assistant to contact plaintiff. A nuisance offer of settlement was made and refused, resulting in arrangements being made by the insurance company representative for plaintiff to be examined by Doctor Beurlot in Alexandria, Louisiana.
Plaintiff was seen by Doctor Buerlot on July 21, July 30, August 1, August 14, September 8, September 22,[2] and October 6, 1975. X-rays were taken of the right knee, as was an arthrogram, the latter being a more sophisticated type x-ray of the joint.
Doctor Beurlot found a moderate amount of swelling or effusion of the right knee and a slight laxity in the collateral ligament. X-ray revealed mild degenerative changes in the knee. On August 1st there was still some swelling and a knee support was prescribed, with an exercise regimen. On August 14th there was still effusion present, as well as on September 8th. Plaintiff was told to continue his regular occupation and to return in two weeks. On September 22nd there was no swelling but still some laxity of the collateral ligament. On October 6th swelling was present and the doctor felt that plaintiff's symptoms now were probably due to degenerative arthritic changes which were noted in the original x-rays. He felt that the arthritic changes were not caused by the accident. The doctor testified that effusion means fluid in the knee of either blood, serum or an increased amount of normal synovial fluid. Plaintiff had a restriction of approximately 15 degrees when the foot was brought backwards to the buttocks. He testified that usually when the fluid is due to an injury it dissolves, but not always. In some cases it will not dissolve. It can subside then reappear. He opined that plaintiff could continue his regular occupation without substantial pain, although he admitted that the trauma which plaintiff sustained in this accident could be the cause of the knee instability which plaintiff relates. In that connection, the doctor in response to questions stated:

*877 "Q. Now, he indicated to Dr. Perdue I believe that, when Dr. Perdue took his history on September 22nd, that he had to quit working or had to stop after four to six hours, and he has indicated to me that his knee `gives out' on him, and he has never had anything like this before prior to this traumatic episode of April in April of '75. Could this trauma that he sustained in this accident cause this instability or this giving out as he relates?
A. It could, yes.
Q. In fact, it's a medical probability, is it not, or possibility, Dr. Beurlot?
A. Yes.
Q. Particularly in a man of his age?
A. Yes.
Q. And particularly where if the history revealed that he had never had any problems with his knee, that it had been stable and he's been able to work in the woods eight hours a day? And then he sustains trauma and then he has this condition. You would have to relate it to the trauma, would you not?
A. Yes.. . . . .
Q. You would not find it strange or unusual if the man would relate that he was having problems with his knee? That he had some attendant swelling, that after four to six hours of working in the woods that it gives out on him and he has to quit, you would not find that unusual based upon your treatment of him and what you saw and his age and facts that he related to you, would you Dr. Beurlot?
A. No."
Plaintiff was finally examined by Doctor Thomas on December 29, 1975. X-rays were taken of the right knee. The doctor found that plaintiff was unable to completely flex his knee. He found evidence of intra-articular fluid in the knee joint. He concluded that this fluid could subside, but the other hand could become worse. There was evidence of degenerative arthritis which probably pre-dated the injury, but in view of the fact that plaintiff had no knee trouble prior to the accident of April, 1975, that the condition is related to the accident. He felt that plaintiff was suffering a 30% Disability of the right leg and 15% disability of the body as a whole, and he related that to the knee injury. Doctor Thomas was very definite in stating that as of December 29, 1975, he would not certify plaintiff as capable of competing in the labor market on a 40-hour work week.
The totality of the medical and lay testimony satisfies us that plaintiff received a disabling injury to his right knee from the accident of April 24, 1975. His knee is unstable and does not permit him to carry on his normal duties as a woodcutter past a few hours a day. We find no error in the trial judge's conclusion that plaintiff cannot work an 8-hour day or a 40-hour week without disabling pain. His knee instability causes him to lose balance and sometimes fall after a few hours work, and this of course materially increases the hazard to his health and safety.
Although it is uncertain when and if plaintiff will recover, compensation should be awarded for the maximum number of weeks prescribed for permanent disability, since the defendant is protected by the provision of LSA-R.S. 23:1331, permitting revision of the judgment after six months, should the disability terminate.
We therefore affirm the district court judgment granting plaintiff total and permanent benefits. See Tantillo v. Liberty Mutual Insurance Company, 315 So.2d 743 (La.1975) on the significance of lay testimony. See also Carroll v. Southern Casualty Insurance Company, 285 So.2d 370 (La.App. 3rd Cir. 1973); Sanders v. Boh Bros. Construction Company, Inc., 304 So.2d 812 (La. App.3rd Cir. 1974); Futree v. Hartford Accident & Indemnity Company, 276 So.2d 271 (La.1973).
PENALTY AND ATTORNEY FEES
While plaintiff was still under the care of Doctor Sills he voluntarily returned to his *878 former employment with defendant Albert Clifton. Defendant insurer's claim manager, Mr. Hendrick, who had the responsibility of handling plaintiff's claim discontinued plaintiff's compensation on June 9, 1975. He said that on June 4th he received a report from Doctor Sills which stated that plaintiff might be able to return to his regular job on May 30, 1975. He then talked to Albert Clifton on June 9, 1975, who told him that plaintiff had returned to work. He didn't see any reason to have an activity check because Clifton told him plaintiff was back at work.
Mr. Hendrick admitted receiving plaintiff's aforementioned letter on June 27, 1975, and also as aforementioned plaintiff was sent to be examined by Doctor Beurlot. Mr. Hendrick admitted receiving reports from Doctor Beurlot but took the position that plaintiff was not disabled even though one report indicated that plaintiff had some traumatic soreness in his right knee.
Finally, even though plaintiff lived in Lena, Louisiana, a distance of about 25 miles from Alexandria, where Doctor Beurlot practiced his profession, the plaintiff was not furnished travel expenses for the several trips he made to Doctor Beurlot's office for examinations. In that connection Mr. Hendrick testified:
"Q. Your file does not reveal that you paid this man any expenses for traveling from his home down to see Dr. Beurlot?
A. None was ever requested. If the man asks us to help him with his travel expense, we will pay him a mileage rate. If he doesn't ask, we don't."
We feel, as did the district judge, that penalties and attorney fees are due plaintiff. Merely because plaintiff went back to work originally was not in itself sufficient grounds to discontinue his compensation. The medical report in the adjuster's possession did not specifically state that plaintiff could return to his former duties on May 30, 1975. In view of this, it was incumbent upon the insurer to determine if plaintiff was in fact performing all of his prior duties.
We also feel that after being placed on notice by plaintiff that he was unable to work more than a few hours a day and with the subsequent reports from Doctor Beurlot, that the insurer should have at least made an effort to determine whether compensation should have been reinstated. This it did not do. Williams v. Liberty Mutual Insurance Company, 327 So.2d 462 (La.App.3rd Cir. 1976); Carroll v. Southern Casualty Insurance Company, 285 So.2d 370 (La.App.3rd Cir. 1973); Horn v. Vancouver Plywood Company, 322 So.2d 816 (A).App. 3rd Cir. 1975); DeJean v. B. F. Trappey's Sons, Inc., 285 So.2d 297 (La.App. 3rd Cir. 1973); Chavis v. Maryland Casualty Company, 307 So.2d 663 (La.App. 3rd Cir. 1975), writ refused 310 So.2d 854 (La.).
Defendant's insurer is also vulnerable for penalties and attorney's fees for the reason that it failed to furnish plaintiff with travel expenses for the several trips to and from Alexandria to be seen by Doctor Beurlot. When defendant sent plaintiff to Alexandria for examination by a doctor of its choice, travel expenses should have been furnished. A claimant's travel expenses in seeking medical attention form part of his medical expense claim and same is subject to the statutory penalty provisions. Jack v. Fidelity & Casualty Company of New York, 326 So.2d 584 (La.App. 3rd Cir. 1976), writ refused April 23, 1976.
For the above and foregoing reasons the judgment of the district court is affirmed. Costs on appeal are assessed against appellants.
AFFIRMED.
HOOD, J., dissents and assigns written reasons.
HOOD, Judge (dissenting).
In my opinion the evidence does not establish that plaintiff has been disabled at any time after the payment of compensation benefits was discontinued. Assuming that he was disabled after that time, I think my colleagues erred in finding that defendant *879 was arbitrary or capricious in discontinuing compensation payments under the circumstances existing here.
Plaintiff Norris sustained relatively minor injuries on April 24, 1975, when the top of a tree struck him as it fell. He recovered from all of those injuries quickly and without any residuals, except that he claims that his right knee still bothers him. The injury to his knee consisted of a strain or sprain, there being no fractures and no injury to the bones or cartilages in the knee. Plaintiff had degenerative arthritis of the knee, which had existed long before this accident occurred, but he was never disabled by that arthritis either before or after the accident.
The evidence shows that plaintiff was off work from the date of the accident, April 24, until May 5, 1975, a period of about 11 days. On the last mentioned date he returned to work for the same employer, Albert Clifton, performing the same kind of work, and he has been performing that same kind of work continuously since that date. He was still working at the same kind of employment on the day of the trial. He voluntarily left his employment by Clifton on September 1, 1975, and since that date he has been working for Marvin Shackleford, performing the same type of work.
Clifton testified that for a period of four or five weeks after plaintiff returned to work following the accident he did not cut as much wood as he usually cut prior to the accident, but that after that four or five week period Norris then worked full time, cutting as much wood as he had ever cut before, and that he made no complaints at all about his knee or about any other part of his body.
Plaintiff contends that prior to the accident he worked up to ten hours per day, but that after the accident he has been able to work only four or five hours a day, although he concedes that on some days he worked as much as seven hours. He testified that his earnings before the accident amounted to about $250.00 to $300.00 per week, but that after the accident they have amounted to only $150.00 per week, or less. He attributes his alleged decrease in earnings to his knee injury.
Mr. Clifton's testimony conflicts with that of plaintiff. Clifton stated that plaintiff worked six or seven hours a day before the accident, that for the first few weeks after plaintiff returned to work for him he "didn't cut as much wood as he did before that," but that after four or five weeks following the accident plaintiff did the same amount of work he had ever done, and that he did not complain of any injuries to his knee or to any other part of his body. Clifton referred to his records and testified that for the week ending June 13, 1975, plaintiff earned $170.94. For the week ending June 20, he received $392.31, and for the week ending June 27, he was paid $481.87. These payments, all made for work done after the accident, average considerably more than plaintiff said he earned before he was injured. Plaintiff does not contest Clifton's statements as to the former's earnings.
Shackleford, who has been plaintiff's employer since September 1, 1975, testified that Norris is a "good pulpwood worker," that he normally works six to seven hours per day, as do his other employees, and that he sometimes works as much as eight hours a day. He stated that during one period of time while plaintiff was working for him, his cutters were allowed quotas of wood to be cut, and that Norris always kept up with his quotas of wood and was never behind. He stated that he has gone out to the woods on some occasions and told Norris not to cut any more wood because the employer was unable to haul any more at that time.
Immediately after the accident occurred, plaintiff was treated by a general practitioner of his own choosing, Dr. Sills. Dr. Sills treated him for a period of five or six weeks, until June 2, 1975, and he stated that on or about the last mentioned date he submitted a physician's report stating that Norris "might be able to resume regular work on May 30." An officer of the defendant insurer, while being cross-examined by plaintiff's counsel at the trial, read from a report submitted by Dr. Sills to the insurer, *880 dated May 28, and received by defendant on June 4, 1975. He quoted that report as indicating that plaintiff could "resume light work on a trial of 5/20/75," and that Norris "will be able to resume regular work on 5/30/75." The testimony of the officer of the insurer clearly is correct as to the contents of the doctor's report, since the witness read from the report while being questioned by plaintiff's own counsel and plaintiff does not contradict that testimony. There is no question but that Dr. Sills, plaintiff's treating physician, reported that Norris "will be able" to resume his regular work on May 30, 1975. In any event, the insurer contacted plaintiff's employer on June 9, and it discovered at that time that plaintiff had returned to work for the same employer, performing the same work, several weeks prior to the time it received Dr. Sills' report, and that he was still working when the above report was received. The insurer thereupon discontinued the payment of compensation benefits.
I can find no fault on the part of the insurer in discontinuing the payment of compensation benefits after receiving the above report of Dr. Sills, and after determining that plaintiff had been working at his regular employment for several weeks before the doctor's report was received.
On June 27, 1975, plaintiff wrote to the adjuster stating that he cannot work more than four or five hours per day, and inquiring as to whether defendant was "planning on making a settlement with me." Upon receipt of that letter, the adjuster arranged for plaintiff to be examined by Dr. Beurlot, an orthopedic surgeon in Alexandria, who examined and treated plaintiff from July 21 until October 6, 1975. Dr. Beurlot found that plaintiff had degenerative arthritis of his knee, which had existed long before this accident occurred, but he felt that that condition was not caused or aggravated by the accident. Dr. Beurlot was firm in his opinion that plaintiff was not disabled, and that he was able to perform his regular duties as a pulpwood cutter. My colleagues have quoted a part of the testimony of Dr. Beurlot, which gives his responses to some hypothetical questions. I find the following portions of his testimony to be far more direct and significant:
"Q. Did you feel that these arthritic changes had anything to do with the accident that he described to you?
A. No, They were noted on the initial X-rays at the time of his first examination." (Tr. 26) * * * * * *
"Q. Did you feel that he could continue his regular occupation without working in substantial pain?
A. Yes." (Tr. 27)
* * * * * *
"Q. You felt that he could continue in his occupation and did you feel that he could do the same type of work that he was doing at the time he was injured?
A. Yes.
Q. Without substantial pain or discomfort?
A. Yes." (Tr. 27)
* * * * * *
"Q. As of that date (October 6, 1975), you had no question in your own mind that he was able to do the same type work without pain?
A. Yes." (Tr. 39)
The record shows, therefore, that Dr. Beurlot, the only orthopedic surgeon who examined and treated plaintiff, felt that plaintiff was able to return to his regular employment, performing the same type of work he had always performed, without any residual disability.
Plaintiff was examined by Dr. Thomas, a general practitioner, on December 29, 1975, about eight months after the accident occurred. Dr. Thomas examined him on only one occasion, and then solely for the purpose of trial and not for treatment. He found that plaintiff had degenerative arthritis of the knee, as did the other doctors, but he felt that the accident had aggravated the arthritis and that plaintiff was disabled.
According to the record, therefore, both of the treating physicians, a general practitioner *881 and an orthopedic surgeon, felt that plaintiff was not disabled, and that he was able to return to his regular duties. One general practitioner, who examined plaintiff on only one occasion eight months after the accident occurred and then solely for the purpose of trial, felt that plaintiff is disabled and that his disability was connected with the accident. In addition thereto, the evidence shows that plaintiff has been working regularly, without interruption, since May 5, 1975, or eleven days after the injury was sustained. I do not believe that the evidence satisfies the burden of proof which rests on plaintiff to show that he is disabled, or that there is a causal connection between the accident and any abnormal physical condition he may have at this time.
Assuming that plaintiff was disabled as a result of the accident, as found by my colleagues, I cannot agree that the defendant was arbitrary or capricious in discontinuing the payment of compensation benefits under the facts which it had at the time those payments were stopped.
The trial judge indicated in his reasons for judgment that he was assessing penalties primarily because the defendant had not offered to pay plaintiff reasonable travel expenses for the visits he made to the orthopedic surgeon in Alexandria. An officer of the defendant insurer explained, however, that no request was ever made for travel expenses, and that it would have paid him a "mileage rate" if such a request had been made. In my opinion defendant cannot be said to have been arbitrary or capricious in failing to pay travel expenses under those circumstances.
Considering all of the evidence I do not believe that there is sufficient justification for assessing penalties and attorney's fees against defendant, even if plaintiff has been disabled.
For these reasons, I respectfully dissent.
NOTES
[1] This cause of action arose prior to the effective date of the numerous amendments to the Louisiana Workmen's Compensation Act in 1975.
[2] On this date plaintiff was seen by Dr. Perdue, an associate of Dr. Beurlot. But Dr. Perdue's notes were testified to by Dr. Beurlot without objection.