380 So.2d 214 (1980)
Gary WILEY, Plaintiff-Appellant,
v.
SOUTHERN CASUALTY INSURANCE COMPANY et al., Defendants-Appellees-Appellants.
No. 7414.
Court of Appeal of Louisiana, Third Circuit.
January 30, 1980.
*215 Fuhrer & Flournoy, George A. Flournoy, Alexandria, for plaintiff-appellant.
Knoll & Knoll, J. Eddie Knoll, Marksville, for defendants-appellees.
Before CULPEPPER, DOMENGEAUX and STOKER, JJ.
*216 STOKER, Judge.
This is a workmen's compensation case in which plaintiff, Gary Wiley, claims injuries as a result of a tree falling on him on August 30, 1978. Prior to the accident, plaintiff had no back trouble. The injury caused a condition of spondylolisthesis in the lumbosacral area to become symptomatic. The trial court found plaintiff to be totally and permanently disabled. Compensation was awarded to plaintiff at the rate of $130 per week, but the trial court denied plaintiff's claim for penalties and attorney's fees. Plaintiff appealed from the judgment insofar as it did not award penalties and attorney's fees. The defendants, Southern Casualty Insurance Company and Vernico, Inc., answered the appeal. In the answer to the appeal defendants-appellees-appellants seek (1) a reversal of the holding that plaintiff-appellant is permanently totally disabled and (2) additionally, they seek damages for frivolous appeal.
The issues before this Court of Appeal are as follows:
(1) Is plaintiff-appellant, Gary Wiley, only temporarily totally disabled rather than permanently totally disabled, as the trial court found?
(2) Did the trial court err in failing to award penalties and attorney's fees?
(3) Are defendants-appellants entitled to damages for frivolous appeal?

FACTS
There is no dispute over the fact that plaintiff sustained a work-related accident or that his compensation rate is $130 weekly. At the time of trial all compensation due plaintiff had been paid to him. (As will be related later, plaintiff was taken off of compensation for a certain period and put back on after suit was filed.) Just prior to the time of trial, plaintiff had been operated on by Dr. T. E. Banks, and it was clear that the medical expenses incurred in connection with the operation would be paid.
The disputes arise from the following facts. Mr. Riley was first seen by Dr. Bernard Kaplan and was hospitalized at Rapides General Hospital in Alexandria, Louisiana. Dr. D. M. Kingsley, an orthopaedist, saw plaintiff on September 23, 1978, and several times thereafter. The doctor-patient rapport broke down, and plaintiff elected to switch to Dr. Douglas Gamburg, an orthopaedist, who first saw plaintiff on October 10, 1978. Dr. Gamburg found that plaintiff was suffering pain and felt that plaintiff's injury had aggravated a pre-existing spondylosis and spondylolisthesis at the lumbosacral level. This caused a forward slippage of L-5 vertebra on S-1.
Dr. Gamburg was of the opinion that plaintiff's condition was pre-existent but not necessarily congenital. He felt plaintiff would recover with time and support. Therefore, he elected to treat plaintiff conservatively. In Dr. Gamburg's opinion plaintiff's pain was from the soft tissues around the defect (the spondylolisthesis) and capsules in the joints of the lower back. Plaintiff was advised to wear a corset for back support. Dr. Gamburg continued to see plaintiff and follow his case. On November 3, 1978, Dr. Gamburg felt there had been improvement in plaintiff's condition. At the time Dr. Gamburg advised plaintiff to try and return to work but to wear his corset and take aspirin as needed for pain. Plaintiff followed this advice, but according to plaintiff's testimony he could barely make it through one short day of work.
On December 15, 1978, because of plaintiff's protracted symptomatology, Dr. Gamburg recommended that plaintiff be readmitted to the hospital for further evaluation. Plaintiff was admitted to Rapides General Hospital on January 2, 1979. Dr. Gamburg had in mind a surgical stabilization on the lumbosacral spine and performed a myelogram before recommending surgery. The results of the myelogram were negative.
Although plaintiff's myelogram was negative and no muscle spasms were found and all clinical tests failed to disclose positive findings, Dr. Gamburg recommended a surgical *217 fusion because of the continued complaints of pain. This would result in stabilization of the lumbosacral joint at L-5 and S-1. The surgery was scheduled. At this point plaintiff's wife intervened. She became so upset and distraught at the prospect of plaintiff undergoing surgery that plaintiff declined to go through with the surgery. Plaintiff was discharged from the hospital January 4, 1979. On January 16, 1979, Dr. Gamburg submitted a written report to the defendant compensation carrier, Southern Casualty Insurance Company. The letter reads as follows:

January 16, 1979
SOUTHERN CASUALTY
P. O. Box 5756
Alexandria, LA 71301
 Re: Gary Wiley
Gentlemen:
I re-evaluated Gary Wiley on December 15, 1978, at which time he had continued complaints of lower back pain aggravated by bending, stooping, and prolonged standing. He had been unable to return to work because of this pain and stated that he had been faithful in wearing his support.
Mechanical and neurologic examination was within normal limits.
A repeat lateral radiograph of the lumbosacral spine revealed a three millimeter spondylolisthesis which had been previously noted. There had been no apparent change over radiographs taken in October.
Because of this patient's protracted symtomatology I recommended that he be admitted for further evaluation and consideration of lumbosacral stabilization.
He was admitted to Rapides General Hospital on January 2, 1979, and underwent lumbar myelography on the same date. His myelogram was entirely within normal limits.
Surgical stabilization of the L-5/S-1 segment had been scheduled but the patient, after discussion with his wife, decided to decline surgical treatment. He was discharged on January 4, 1979, in satisfactory condition. I have nothing to offer Mr. Wiley in the way of further treatment. If I can furnish you with additional information, please advise.
 Yours truly,
 s/ D. Gamburg, M. D.
 Douglas L. Gamburg, M. D.
DLG/ly
It was stipulated by the parties that the statement in paragraph one of Dr. Gamburg's report to the effect that "He had been unable to work because of his pain..." was a report of plaintiff's statement to Dr. Gamburg and not a finding of Dr. Gamburg. (Tr. 114)
The January 16, 1979, report of Dr. Gamburg was received by Clyde P. Roy, Claims Representative of Southern Casualty Insurance Company. Mr. Roy sought some elaboration and interpretation and called Dr. Gamburg on receipt of the report on January 17, 1979. After conferring with Dr. Gamburg by telephone, Mr. Roy made a memorandum of the conversation in typewritten form which is in evidence. (D-2) It reads as follows:
January 17, 1979
Memo: Gary Wiley
Called Dr. Gamburg and spoke to him personally regarding Gary Wiley. Dr. Gamburg's report dated January 16, 1979 stated that the myelogram was negative and that surgical stabilization was scheduled but that Wiley declined surgical treatment. Dr. Gamburg advised me that according to the examinations performed on Mr. Wiley, he personally felt that there was nothing wrong in regards to Wiley's complaints and of course, believed this to be absolutely correct when Wiley declined surgical treatment. Dr. Gamburg also stated that he felt if Wiley was really hurt that he would have had the surgical stabilization performed. Based on Dr. Gamburg's report and his opinion of the current status of Gary Wiley, we are holding compensation benefits today.
CPR/ks
Based upon Dr. Gamburg's report of January 16, 1979, and Mr. Roy's conversation with Dr. Gamburg, compensation was cut off as of January 16, 1979. It was not *218 resumed until April 6, 1979. Mr. Roy testified that at no time did Dr. Gamburg testify that plaintiff was able to return to work. He further testified that he never asked Dr. Gamburg if plaintiff was able to return to work. The failure of the compensation carrier to have an unequivocal statement from Dr. Gamburg is the principal basis for plaintiff's claim for penalties and attorney's fees. Mr. Roy testified that, on the basis of the letter and conference with Dr. Gamburg, he felt he was justified in cutting off compensation. Dr. Gamburg remembered having the conversation but could not recall the specific substance of the telephone conversation.
After discharging plaintiff on January 14, 1979, Dr. Gamburg did not see plaintiff again. Plaintiff testified he was able to quiet his wife's fears and decided to go ahead with the surgery. On January 23, 1979, plaintiff's attorney took the matter up with Dr. Gamburg. The latter testified doubt had arisen in his mind concerning the psychological maturity and sincerity of plaintiff. Because plaintiff had declined surgery in early January, Dr. Gamburg had reservations and suggested that plaintiff be evaluated by a clinical psychologist. This was done. Dr. Gamburg scheduled an appointment with Clinical Psychology Associates for February 12, 1979. Dr. James W. Quillan examined Mr. Wiley and administered certain tests to him. A report by Dr. Quillan dated February 13, 1979, was furnished to Dr. Gamburg, and he then declined to perform surgery for plaintiff.[1]
Dr. T. E. Banks, an orthopaedist, examined plaintiff on March 5, 1979, and submitted a medical report to plaintiff's attorney dated March 8, 1979. (P-8 and D-1) In a report dated March 8, 1979, Dr. Banks confirmed the fact that plaintiff had a symptomatic spondylolisthesis and suggested a special fusion.[2]
Dr. Banks performed the surgical procedure for the spinal fusion on April 1, 1979. This case went to trial on April 23, 1979. Although the compensation carrier had cut off compensation as of January 16, it refused to resume compensation upon being furnished a copy of Dr. Banks' initial report of March 8, 1979. However, it did indicate that it would pay for the surgery if plaintiff had Dr. Banks perform it. (Tr. 74) *219 After the surgery was performed by Dr. Banks, all compensation was immediately brought up to date and was being paid currently at the time of trial.
There is some difference of opinion as to the time which would be required for plaintiff to recover or be able to attempt work in his former occupation as a logger. Dr. Banks indicated that one can be reasonably optimistic at about four months, but he felt that eight months to a year should elapse before one can be certain the fusion is successful. Dr. Banks thought it would be a minimum of eight months before plaintiff could safely return to work, and he would rather plaintiff wait a year. Dr. Gamburg testified that a determination can be made in three to four months, but he would not advise anyone to go back to work after such time without wearing some type of support. Dr. Banks testified as to the chances for a successful fusion. He stated that a one joint fusion had a rate of success of around 92%. Dr. Banks estimated that with a successful fusion he would expect that plaintiff would not have over a 20% disability of the back. There is no loss of any functional degree of motion, but there will be scar tissue; there is a potential for pain on stretching the scar tissue, and there may be some possible permanent loss of full muscle strength.
At the trial Clyde P. Roy was cross-examined concerning the reason for the compensation carrier's willingness to pay for Dr. Banks' operation and to resume compensation if plaintiff went ahead with the surgery. In explaining his reasons for not resuming compensation upon receipt of Dr. Banks' report, Mr. Roy stated that as plaintiff had refused surgery once before, his company did not know whether or not plaintiff would decline again. He admitted that his company took the position that it was not going to pay weekly compensation until and unless plaintiff underwent surgery.

DURATION OF PLAINTIFF'S DISABILITY
The trial court found plaintiff to be totally and permanently disabled. At the time of trial plaintiff was up from surgery performed approximately two weeks before trial. The success of the operation could not be known for some months. Certainty of success could not be known under Dr. Banks' testimony for eight months, at least, and probably not for a year. Chances of success were 92%. Under the circumstances, there was ample justification for the trial judge's finding that the plaintiff's disability was permanent as well as total.
Our Louisiana Supreme Court has stated the general rule relative to temporary and permanent total disability cases in Walker v. Gaines P. Wilson & Son, Inc., 340 So.2d 985 (La.1976). It was stated there as follows: "A judgment for total permanent disability should be awarded when the claimant is shown to be totally disabled at the time of trial and the duration of such disability is indefinite or the evidence does not clearly indicate its duration." In the Walker case the plaintiff underwent a laminectomy to remove a herniated disc sustained in a work-related accident. Months later he was still suffering disabling pain residual to the surgery. To rectify this condition further surgery by fusion was required.
A panel of this court recently considered a question of whether temporary or permanent total disability should be found in Breaux v. Marine Electric and Reliance Insurance Company, 369 So.2d 196 (La.App. 3rd Cir. 1979), writ refused 371 So.2d 1344 (La.1979). There this court reversed a trial court finding of permanent total disability and held it was only temporary. The Breaux case is distinguishable on its facts from the one before us.
In Breaux, the plaintiff underwent surgery for a ruptured disc. His surgeon testified that a final estimate of disability could not be made until six months after surgery, but he should have only 5% residual disability of the body as a whole. When the trial took place five months had elapsed since the surgery. Although it was too soon after surgery for the surgeon to express an opinion as to whether Breaux could return to *220 hard manual labor which he was performing at the time of trial, the surgeon felt Breaux would be able to return to gainful employment. On the other hand, Breaux was recovering normally from the surgery. Under the circumstances this court felt Breaux's disability was temporary rather than permanent.
As distinguished from the Breaux case, plaintiff, Gary Wiley, in the opinion of his treating physician and surgeon, cannot be determined to have had a successful spinal fusion for 8 to 12 months. There is an 8% chance he will not. After sufficient time elapses to validly evaluate the success of Wiley's surgery, if it is found to be successful, he will have a predictable disability of between 15 and 20% of the back. Under the circumstances we are of the opinion that the rule announced in Walker v. Gaines P. Wilson & Son, Inc., supra, should be applied here. Thus, we will affirm so much of the trial court's holding which held plaintiff Wiley to be permanently totally disabled.
As noted in Breaux, the matter makes little practical difference. Under LSA-R.S. 23:1331 the judgment is subject to modification after six months on the application of either party to show that the disability had subsequently diminished or increased.

PENALTIES AND ATTORNEY'S FEES
The trial court found that the compensation carrier's actions were neither arbitrary nor capricious, and that it did not act without probable cause. This is the sole holding from which plaintiff-appellant appeals. He urges the carrier was arbitrary and capricious in several respects: (1) in forcing plaintiff into dangerous surgery as a condition of resuming payment of compensation benefits, (2) terminating benefits on the basis of Dr. Gamburg's medical report of January 16, 1979, and telephone conversation which did not in fact advise that plaintiff was physically able to return to work and (3) failing to resume payments upon the receipt of Dr. Banks' report of March 8, 1979.
In this case the termination of benefits as of January 16, 1979, was an ex parte action taken by the carrier without judicial sanction. Suit was filed by plaintiff on February 1, 1979. Compensation payments were not then resumed. Not until plaintiff underwent surgery by Dr. Banks was compensation resumed and brought up to date.
The medical testimony establishes that a person may have a condition of spondylolisthesis without experiencing any symptomatology at all. The person may be totally without pain or discomfort, yet x-ray will indicate the presence of the condition. A spondylolisthesis which becomes symptomatic is one that produces pain. The normal course of treatment where the condition becomes symptomatic is to rely first on conservative measures, applying support such as a corset or brace. If conservative treatment does not alleviate the pain, the only recourse is to resort to surgical stabilization or the patient must change occupations.
Dr. Gamburg testified in his deposition concerning his medical report of January 16, 1979. His statement that he had "nothing to offer Mr. Wiley in the way of further treatment" meant simply that, since Mr. Wiley had rejected the surgery at the time of his January 2-4 hospitalization, there was nothing more in the way of medical treatment which he could offer. In Mr. Roy's typewritten notes of his January 17 telephone conference with Dr. Gamburg, Mr. Roy writes as though he got the impression that plaintiff was not really suffering enough pain to have a true symptomatic spondylolisthesis. However clearly that implication may shine through Mr. Roy's version of the report, Dr. Gamburg never said so unequivocally. Not even in his deposition did Dr. Gamburg say he thought plaintiff's condition was not symptomatic. Unquestionably he had his doubts, but he did not go so far as to recall his original diagnosis.
On the basis of Dr. Gamburg's initial examination the compensation carrier accepted the conclusion that plaintiff was suffering from a symptomatic spondylolisthesis. *221 Compensation payments were begun on the basis that the pain resulted from the work-related accident.[3] The payments should have been continued beyond January 16, 1979, regardless of whether the employee underwent or refused surgery. Dr. Gamburg never testified that plaintiff was able to return to work as of January 16, 1979. Irrespective of any doubts which may have developed in Dr. Gamburg's mind when plaintiff refused to go ahead with the surgery, he could hardly then make an unequivocal diagnosis that plaintiff was not suffering pain and was able to return to work.
The fact that injured employees may not be cut off of compensation on the basis of inconclusive medical reports is well established. Horn v. Vancouver Plywood Company, 322 So.2d 816 (La.App. 3rd Cir. 1975) and Norris v. Southern Casualty Insurance Company, 342 So.2d 874 (La.App. 3rd Cir. 1977). Also it is incumbent upon the insurer to make a reasonable effort to ascertain a plaintiff's exact condition at the time which compensation benefits are terminated. Williams v. Liberty Mutual Insurance Company, 327 So.2d 462 (La.App. 3rd Cir. 1976).
For the foregoing reasons we deem that under the jurisprudence of this state the action of Southern Casualty Insurance Company in terminating plaintiff's compensation on January 16, 1979, was arbitrary and capricious within the meaning of LSA-R.S. 22:658 and requires the imposition of penalties and attorney's fees. Moreover, it was arbitrary and capricious to terminate plaintiff's compensation for the purpose of forcing him to undergo surgery. Bass v. Service Pipe Trucking Company, Inc., 289 So.2d 78 (La.1974). In Bass it was held that the reasonableness of an employee's refusal to undergo surgery was a legal rather than a medical question.[4] The right to a legal determination carries through the appellate review stage. Consequently, it was arbitrary and capricious for the defendant carrier to terminate plaintiff's compensation because he refused surgery.
Among plaintiff's contentions is the assertion that in any event, when Dr. Banks' report of March 8, 1979, was received, defendants were put on notice of plaintiff's continuing suffering because of symptomatic spondylolisthesis. Plaintiff cites Walker v. Gaines P. Wilson & Son, Inc., supra, as requiring resumption of payment of compensation upon receipt of such a report. While there is point to the argument, we deem the actions previously discussed as fully justifying penalties and attorney fees. In addition, by the time of trial, April 23, compensation had been brought up to date, and we do not know when it was actually brought up to date. Hence, we do not find it necessary to pitch our holding on this point.
It is our holding that plaintiff is entitled to the statutory penalty of twelve percent as damages on all workmen's compensation *222 which accrued to plaintiff after January 16, 1979, until it was brought up to date. It was stipulated at trial that plaintiff had been brought up to date and defendants were current with their payments. In this respect we reverse the trial court. In our opinion plaintiff should be awarded attorney's fees in the amount of $2,500.00.
The judgment for penalties and attorney's fees should run against Southern Casualty Insurance Company only. The employer Vernico, Inc., being insured by Southern Casualty Insurance Company, cannot be liable for penalties and attorney's fees. Brock v. Tidewater Construction Company, 318 So.2d 100 (La.App. 3rd Cir. 1975).

FRIVOLOUS APPEAL
From the foregoing it is obvious that we do not deem the appeal in this matter prosecuted by plaintiff to have been frivolous. Damages in this regard sought by defendants-appellees-appellants are denied.

DECREE
For the reasons assigned, the judgment appealed is reversed insofar as it denies penalties and attorney's fees, and it is now ordered, adjudged and decreed that there be judgment herein in favor of plaintiff, Gary Wiley, and against Southern Casualty Insurance Company for penalties as provided in LSA-R.S. 22:658 in the amount of 12% of the total amount of compensation payment due from January 16, 1979, until the date such compensation was brought up to date. It is further ordered, adjudged and decreed that there be judgment in favor of plaintiff and against Southern Casualty Insurance Company in the sum of $2,500 as attorney's fees. The judgment appealed is amended to give defendant credit for all workmen's compensation benefits paid. In all other respects, the judgment appealed is affirmed. All costs of this appeal are assessed against the defendants-appellees-appellants, Vernico, Inc. and Southern Casualty Insurance Company in solido.
REVERSED IN PART, AMENDED AND AFFIRMED IN PART.
NOTES
[1] In Dr. Quillan's deposition he states he concluded plaintiff was a truthful and sincere young man. Dr. Gamburg did not elaborate in his deposition on why he declined to perform the surgery.
[2] Dr. Banks' March 8, 1979, report reads in part as follows:

I will not go into details of the injury and previous care.
At the present time he is wearing a corset and he states that this helps relieve some of the pain. He tried to cut timber using the corset and he could not. He tried to go back to work at a grocery store, but stated that prolonged standing on his feet was painful. He feels rather marked stiffness in the back in the mornings and neck flexion pulls his low back. This is much better by noon. Pain is centralized in the low back region and he does not have any tingling sensation in his legs or any pain.
Myelography has been reported as normal at Rapides General Hospital.
On examination, the patient has no true muscle spasm in his back. He has pain in the lumbosacral region on hyperextension of the lumbar spines and some restriction of full forward flexion. He has no tenderness in either sciatic notch and tenderness is well localized in the lumbosacral area in the midline.
Examination of the lower extremities reveals straight leg raising to 80% bilaterally, this being productive of back pain, but not sciatic pain. Reflexes and sensation are normal in both lower extremities and there is no atrophy present.
X-rays were reviewed and X-rays revealed a spondylolisthesis with bilateral pars interarticularis defect at the lumbosacral area with forward slipping of not more than about three millimeters.
I feel this young man does have a symptomatic spondylolisthesis. The question of spinal fusion has been brought up to him previously. I think when he understands the magnitude of the procedure and the time it takes to recover and the percentage of recovery, surgery can be done.
The patient seems to have a desire to get well and apparently he will follow the recommendation for spinal fusion. If this is true, arrangements can be made for this to be done either by this operator or somebody else.
If you desire any further information, please advise.
Very truly yours,
s/ T. E. Banks, M.D.
T. E. BANKS, M. D.
[3] Defendants in their brief refer to the testimony of Dr. Daniel Kingsley to bolster the termination of plaintiff's compensation following the incident of January 16, 1979. Dr. Kingsley disagreed with Doctors Gamburg and Banks and emphatically asserted that there was no spondylolisthesis at L-5 and S-1. He found defects at L-4 and L-5. Dr. Kingsley apparently disbelieved plaintiff and was of the opinion that he had no disability. Nevertheless, when plaintiff switched to Dr. Gamburg and the latter became plaintiff's treating physician, defendants were bound by his findings. Therefore, unless Dr. Gamburg had reported that plaintiff was able to return to work, plaintiff's compensation could not justifiably be terminated, and Dr. Kingsley's opinions had no bearing on the issues.
[4] The applicable law concerning sanction to be applied where an injured worker refuses reasonable surgical treatment was stated in the Bass case as follows:

In our workmen's compensation act, the legislature did not require an employee to submit to surgery as a condition for his receiving compensation benefits due him, except in the case of a hernia, see La.R.S. 23:1221(4)(q). Nevertheless, as the decisions cited below show, the courts have established the equitable doctrine that while, they may not require an injured employee to submit to surgery, they may order his compensation payments withheld or suspended when he unreasonably refuses to submit to simply surgery which will remove his disability.